# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREGORY SLATE,

               Plaintiff,

               v.

PUBLIC DEFENDER SERVICE FOR THE
DISTRICT OF COLUMBIA, *et al.*,

               Defendants.

Civil Action No. 13-00798 (BAH)

Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

Plaintiff Gregory Slate, who is proceeding *pro se*, was employed for less than two years at the Public Defender Service for the District of Columbia ("PDS"), and has now filed a lawsuit against PDS and his former PDS supervisor, Rachel Ann Primo, claiming discrimination on the basis of his race and sex, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the District of Columbia Human Rights Act of 1977 ("DCHRA"), D.C. Code §§ 2-1401.01 *et seq.*, as well as various common law claims. *See* Notice Filing Redacted Doc. Ex. 1 ("Compl.") ¶¶ 127–214, ECF No. 15-2.[1] Pending before the Court are both defendants' motions to dismiss for failure to state a claim upon which relief may be granted, under Federal Rule of Civil Procedure 12(b)(6). PDS' Mot. Dismiss, ECF No. 17;

---

[1] Shortly after the plaintiff filed his Complaint, the Court granted PDS' request to redact "numerous highly prejudicial and unsupported allegations . . . that have no bearing on his underlying allegations against Defendants." *See* Mem. Supp. PDS Mot. Seal Pl.'s Compl. at 1, 5, ECF No. 3-1; 7/23/2013 Minute Order. A redacted version of the Complaint was filed on July 25, 2013. *See generally* Compl. The instant motion is resolved upon consideration of the entire Complaint, *see* Compl. ("Compl. (unredacted)"), ECF No. 1, while any quotations are from the redacted version of the Complaint. The plaintiff in his opposition repeats his objection to the redactions made in the Complaint. *See* Pl.'s Opp'n. Def. Primo's Mot. Dismiss & Mot. File Opp'n Def. PDS' Mot. Dismiss ("Pl.'s Opp'n") at 4–6, ECF No. 27. The "interrelated and compelling reasons" identified in the Court's Minute Order that warranted granting the defendant's request to redact the Complaint are still applicable, *see* 6/19/2013 Minute Order, and the Court will not unseal the unredacted version of the Complaint as there is no basis to do so for the purposes of resolving the instant motion.

Primo's Mot. Dismiss ("Primo's Mem."), ECF No. 22. For the reasons set forth below, the defendants' motions to dismiss are granted.

## I.    BACKGROUND

### A.    Allegations in the Plaintiff's Complaint

As set forth in the Complaint, the plaintiff is a formerly licensed private detective who was employed by PDS as a felony-1 investigator beginning in August 2008. Compl. ¶¶ 1, 6, 11. PDS is a federally funded, independent legal organization that provides legal representation to persons who are financially unable to obtain adequate representation. *Id*. ¶ 2; PDS' Mem. Supp. Mot. Dismiss. ("PDS' Mem.") at 2, ECF No. 19. According to the plaintiff, he was informed at the time of his hiring that "if [the plaintiff] accepted PDS's offer of employment," he "would only be terminated if the United States Attorney's Office for the District of Columbia or the District of Columbia Attorney General's Office developed a line of cross examination that rendered [the plaintiff's] testimony ineffective or adverse." Compl. ¶ 9. The plaintiff accepted the offer of employment, *id.* ¶ 10, and never signed an "at-will" contract. *Id.* ¶ 13.

For the duration of his employment at PDS, the plaintiff was supervised by Primo. *Id.* ¶ 14. The plaintiff alleges that "[o]ver the course of [his] employment, he was subjected to a long series of overtly sexist, racist, and religious harassment," *id.* ¶ 18, including that Primo "would call Plaintiff a 'pussy' or a 'faggot' and question his manhood," *id.* ¶ 25; Compl. (unredacted) ¶ 63, and also refer to men using a number of similarly crude references, as well as using racial slurs in reference to African-Americans, Compl. ¶¶ 28, 42, 43, 46, Hispanic people, *id.* ¶ 28, and "Muslims, Arabs, and anyone from a middle-eastern country," *id.* ¶¶ 28, 80.

On May 30, 2009, the plaintiff and Primo were involved in a car accident. *Id.* ¶¶ 82–87. According to the plaintiff's version of these events, after work, the plaintiff drove Primo towards Arlington, Virginia, in her car. *Id*. ¶¶ 82–84. While en route, Primo, who was the passenger,

somehow "caused her vehicle to veer off the road," and collide with a pole. *Id.* ¶ 86. After the accident the plaintiff, who alleges that he was injured, accepted a ride from a passing motorist, while Primo remained with the vehicle "to file a police report." *Id.* ¶¶ 87–89. Approximately five weeks after the car accident, on July 9, 2009, the plaintiff claims that he filed an internal formal grievance against Primo, alleging "that he was being discriminated against based on his race, color, sex, and religion." *Id.* ¶ 91. At some unspecified point thereafter, the plaintiff states that PDS no longer permitted him on the premises, *id.* ¶ 93, and prevented him from communicating with PDS employees, using his PDS identification or his PDS email account, or working on any PDS cases, *id.* ¶¶ 93, 95–97.

The plaintiff claims that "in retaliation for Plaintiff's complaints" he was instructed to "travel to 3 different police stations . . . to inquire if a warrant had been issued for Plaintiff's arrest" and cautioned that he would be placed on unpaid leave until he could "demonstrate there was no warrant for his arrest by a date certain." *Id.* ¶¶ 98–99. The plaintiff alleges that he made such demonstration but that, nevertheless, a PDS employee placed a call to "a law enforcement official in Virginia and insisted that he charge Plaintiff with leaving the scene of an accident." *Id.* ¶¶ 100–01. The plaintiff contends that he was subsequently placed on unpaid leave, *id.* ¶ 102, and terminated by PDS "on the pretext that he was 'vulnerable to being impeached upon testifying.'" *Id.* ¶ 108. He further alleges that "[n]either the United States Attorney's Office for the District of Columbia or the District of Columbia Attorney General's Office ever developed a line of cross-examination that rendered Plaintiff's testimony ineffective." *Id.* ¶ 110. He additionally claims that PDS "ultimately claimed that Plaintiff was barred from performing his job because of a 'website' about Plaintiff that PDS knew about before Plaintiff was hired." *Id.* ¶ 103.

The plaintiff states that, "[o]n April 15, 2009," he filed "a Charge of Discrimination with the Equal Employment Opportunity Commission . . . alleging discrimination and retaliation." *Id.* ¶ 118. At some unspecified time after his termination and filing of a formal EEO complaint, the plaintiff claims that he "submitted an application to PDS for certification as a [Criminal Justice Act ("CJA")] investigator," *id.* ¶ 120, but was denied admission into the program on April 28, 2010, "in retaliation" for his protected activity, *id.* ¶ 121. Also "in retaliation for his engaging in protected activity," *id.* ¶¶ 123, 125, the plaintiff claims that he was not hired at some unspecified time by PDS for positions at PDS as a staff investigator and an eligibility examiner, for which he had submitted applications on April 30 and July 25, 2010, respectively, *id.* ¶¶ 122, 124.

The plaintiff filed a second EEO complaint on November 17, 2010, "stating that PDS had engaged in further retaliation by failing to certify him as a CJA investigator, denying him a position as a staff investigator, and denying him a position as an eligibility examiner." *Id.* ¶ 126.

The plaintiff filed the instant suit on May 30, 2013. *See generally* Complaint ("Compl. (unredacted)"), ECF No. 1.

**B.      Factual Matters Referenced In The Complaint**

The plaintiff expressly refers to, but fails to candidly represent, several documents and events in his Complaint, including his EEO complaint allegedly filed on "April 15, 2009," *id.* ¶ 118; PDS' letter placing the plaintiff on leave subsequent to the May 30, 2009 car accident, *id.* ¶¶ 98–99; PDS placing the plaintiff on unpaid leave on July 15, 2009, *id.* ¶ 102; the criminal charge against the plaintiff following his car accident, *see id.* ¶ 101; and the plaintiff's termination by PDS on an unspecified date, *id.* ¶ 108. The documents related to these events directly bear upon the plaintiff's allegations, as evidenced by the Complaint's reference to them, but they are not attached to the Complaint. Nonetheless, the defendants have submitted documents related to these events, and the plaintiff in his opposition has raised no objection to

their submission or to their authenticity.  *See generally* Pl.'s Opp'n Def. Primo's Mot. Dismiss &

Mot. File Opp'n Def. PDS' Mot. Dismiss ("Pl.'s Opp'n"), ECF No. 27.

As a general matter, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the

pleadings are presented to and not excluded by the court, the motion must be treated as one for

summary judgment under Rule 56."  FED. R. CIV. P. 12(d).  This conversion rule need not be

triggered, however, when a court considers "the facts alleged in the complaint, documents . . .

incorporated by reference in the complaint . . . or documents upon which the plaintiff's

complaint necessarily relies even if the document is produced not by the plaintiff in the

complaint but by the defendant in a motion to dismiss."  *Hinton v. Corr. Corp. of America,* 624

F. Supp. 2d 45, 46 (D.D.C. 2009) (citations and internal quotation marks omitted); *see also Abhe*

*& Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007) (court may consider on a motion

to dismiss "facts alleged in the complaint, documents attached thereto or incorporated therein,

and matters of which it may take judicial notice" (quoting *Stewart v. Nat'l Educ. Ass'n,* 471 F.3d

169, 173 (D.C. Cir. 2006))).  Courts have considered documents attached to motions to dismiss

and opposition papers without converting the motion into one for summary judgment when the

documents were referenced in the Complaint and were central to the plaintiff's claims.  *See, e.g.*,

*Saunders v. Mills*, 842 F. Supp. 2d 284, 293 n.2 (D.D.C. 2012) (considered "Letter of Counseling

attached to Defendant's Motion to Dismiss without converting the motion to one for summary

judgment because the letter is repeatedly referenced in the Complaint . . . and 'is central to

plaintiff's claim' that the letter was retaliatory") (citation omitted); *Nat'l R.R. Passenger Corp. v.*

*Veolia Transp. Servs., Inc.*, 592 F. Supp. 2d 86, 92 n.5 (D.D.C. 2009) (citing *Langer. v. George*

*Washington Univ.,* 498 F. Supp. 2d 196, 202 n.1 (D.D.C. 2007) (declining to convert a 12(b)(6)

motion to dismiss into a motion for summary judgment after taking into consideration a letter

that was "referred to and quoted from in the complaint" and was "central to plaintiff's claim"));

*Pearson v. District of Columbia*, 644 F. Supp. 2d 23, 29 n.1 (D.D.C. 2009), *aff'd*, 377 F. App'x

34 (D.C. Cir. 2010) (considering on a motion to dismiss several exhibits, including memoranda,

emails, and letters, attached to defendant's motion to dismiss and mentioned at least once in the

Complaint). In addition, a court may consider, without triggering the conversion rule, "matters

of which . . . judicial notice" may be taken, such as public records. *EEOC v. St. Francis Xavier*

*Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *see Kaempe v. Myers*, 367 F.3d 958, 965

(D.C. Cir. 2004) (finding that court may take judicial notice of public records on motion to

dismiss); *District Hosp. Partners, L.P. v. Sebelius*, No. 11–0116, 2013 WL 5273929, at *12 n.14

(D.D.C. Sept. 19, 2013) (same).

Set against these legal principles, the Court properly considers the following documents

that were referenced in the Complaint and are central to the plaintiff's claims, or are a matter of

public record, without converting the instant motion into a motion for summary judgment: (1)

the EEO complaint filed by the plaintiff and referenced at paragraph 118 in the Complaint, *see*

*Peters v. District of Columbia*, 873 F. Supp. 2d 158, 179 (D.D.C. 2012) (concluding that EEO

complaint and right-to-sue letter in a Title VII action could be properly considered on a motion

to dismiss and were not deemed "outside the pleadings"); *Dyson v. District of Columbia*, 808 F.

Supp. 2d 84, 87 n.3 (D.D.C. 2011) (finding that in Title VII action, "[e]xhibits such as the EEOC

. . . documents attached to plaintiff's opposition may be considered in deciding the motion to

dismiss"); *Baird v. Snowbarger,* 744 F. Supp. 2d 279, 287–8 & n.2 (D.D.C. 2010) (citing *Rogan*

*v. Giant Eagle, Inc.,* 113 F. Supp. 2d 777, 782 (W.D. Pa. 2000) ("It is clear to us that . . . we

may consider the EEOC complaint and related EEOC documents . . . either as undisputed

documents referenced in the complaint or central to the plaintiff's claim . . . .")), *vacated in part*

*on other grounds*, *Baird v. Gotbaum*, 662 F.3d 1246 (D.C. Cir. 2011); (2) the letter placing the plaintiff on administrative leave with pay and advising the plaintiff that he could be placed on unpaid leave if he did not demonstrate that there was no warrant for his arrest, which letter is referenced in paragraphs 98–99 of the Complaint, *see Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) (concluding that court could properly consider on a motion to dismiss chapter of Personnel Manual and "various letters and materials produced in the course of plaintiff's discharge proceedings" attached to plaintiff's opposition that were "referred to in the complaint and [were] central to plaintiff's claims" without converting to a summary judgment motion); (3) the warrant for the plaintiff's arrest, which is referenced in paragraph 101 of the Complaint and is a matter about which the Court may take judicial notice, as it is a matter of public record, *see Causey v. Parish of Tangipahoa*, 167 F. Supp. 2d 898, 906 (E.D. La. 2001) (finding that court may take judicial notice of an arrest warrant); *McPhearson v. Anderson*, 874 F. Supp. 2d 573, 579 & n.7 (E.D. Va. 2012) (considering arrest warrant when ruling on motion to dismiss because it was "a public document [which] does not necessitate conversion of the Motion to Dismiss into a motion for summary judgment"); and (4) the plaintiff's guilty plea in connection with the May 30, 2009 car accident, which is not referenced in the Complaint but is a matter of public record about which the Court may take judicial notice, *see Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005) (citing *Marshall Cnty. Health Care Auth. v. Shalala,* 988 F.2d 1221, 1228 (D.C. Cir. 1993) (court may look to record of another proceeding "to avoid unnecessary proceedings when an undisputed fact on the public record makes it clear that the plaintiff does not state a claim upon which relief could be granted")); *Morris v. Fed. Bureau of Prisons*, No. 09-2034, 2010 WL 2574142, at *1

(D.D.C. June 25, 2010) (collecting cases and concluding that "the Court may take judicial notice of matters of public record, such as prior court proceedings").

Examination of the contents of these documents reveals that prior to the plaintiff's termination, the plaintiff was involved, and ultimately convicted, in criminal proceedings related to the May 30, 2009 car accident. Less than two weeks after the accident, the plaintiff was placed on administrative leave with pay and told that "[p]rior to returning to work," he would have to "demonstrate that there is no outstanding warrant for [his] arrest in Virginia" and "[i]f there [were] a warrant for [his] arrest, PDS will assess the situation and determine [his] status at that time." *See* Decl. of John T. Koerner ("Koerner Decl.") Ex. 1, ECF No. 17-4 (June 11, 2009, PDS letter to the plaintiff)). The plaintiff claims to have demonstrated to PDS "that there was no warrant for his arrest" a week after receiving this letter, Compl. ¶ 100, but subsequently, on June 25, 2009, Arlington County issued a felony arrest warrant for the plaintiff for failure to report a hit and run after leaving the scene of the May 30, 2009 accident without calling the police. *See* Koerner Decl. Ex. 5, ECF No. 17-8 (arrest warrant for felony offense). The plaintiff was then placed on leave without pay on July 15, 2009. Compl. ¶ 102. The plaintiff was charged with driving under the influence and felony hit and run, *see* Koerner Decl. Ex. 4 at 5:7–13, ECF No. 17-7 (transcript of plea proceedings before the Circuit Court for Arlington County, dated January 26, 2010), and six months after being placed on unpaid leave, he pleaded guilty in January 26, 2010, to driving under the influence and to misdemeanor hit and run. *Id.* at 20:3–16. Less than two months later, on March 3, 2010, PDS terminated the plaintiff. *See* Koerner Decl. Ex. 2 at 3, ECF No. 17-5 (EEO Complaint # 570-2010-01067, dated April 15, 2010).

Contrary to the allegations in the plaintiff's Complaint, he did not file his EEO complaint on "April 15, 2009," prior to the accident, *see* Compl. ¶ 118, but rather this charge was filed

against PDS on April 15, 2010, *see* Koerner Decl. Ex. 2 at 2, after the plaintiff had twice been suspended, once with pay and once without pay, and after he had been terminated.[2] The plaintiff's obfuscation of the details surrounding his termination in the service of his claims is ultimately unsuccessful. With these events in mind, the Court turns to the pending motions to dismiss.

### C. The Plaintiff's Claims

The Complaint raises eleven claims. The plaintiff claims that PDS discriminated against him based on his male gender and unspecified race, and retaliated against him, in violation of Title VII, Compl. ¶¶ 127–49 (Counts I, II and III), and the DCHRA, *id.* ¶¶ 150–80 (Count IV, V and VI); and that Primo also discriminated against him based on his gender and race, in violation of the DCHRA, *id.* ¶¶ 181–94 (Count VII and VIII). The plaintiff additionally raises three common law claims, alleging that PDS breached its contract with the plaintiff, *id.* ¶¶ 195–99 (Count IX), and its duty of good faith and fair dealing, *id.* ¶¶ 200–04 (Count X); and that Primo tortiously interfered with the plaintiff's contractual relations with PDS, *id.* ¶¶ 205–14 (Count XI). The plaintiff seeks back pay and back benefits, as well as damages for his physical, mental, and emotional suffering, and injunctive relief. Compl. at 31.

## II. LEGAL STANDARD

### A. Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v.*

---

[2] There can be no serious dispute that the latter date is accurate, as this is the date that is stamped on the EEO complaint. *See* Koerner Decl. Ex. 2 at 2. Moreover, the plaintiff states in his second EEO complaint, filed on November 17, 2010, that he "filed an EEOC charge of discrimination (#570-2010-01067) on or around April 15, *2010.*" Koerner Decl. Ex. 6, ECF No. 17-9 (EEOC complaint # 570-2011-00223 filed November 17, 2010, and date stamped December 6, 2010) (emphasis added); *see also* Compl. ¶ 126.

*Twombly,* 550 U.S. 544, 570 (2007); *see also* FED. R. CIV. P. 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 557). Instead, the complaint must plead facts that are more than "merely consistent with' a defendant's liability"; "the plaintiff [must] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (quoting *Twombly,* 550 U.S. at 557); *accord Rudder v. Williams,* 666 F.3d 790, 794 (D.C. Cir. 2012). The Court "must assume all the allegations in the complaint are true (even if doubtful in fact) . . . [and] must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.,* 525 F.3d 8, 17 (D.C. Cir. 2008) (citations and internal quotation marks omitted).

### B.    Title VII Discrimination Based on Race or Sex

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne,* 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of the Sergeant at Arms,* 520 F.3d 490, 493 (D.C. Cir. 2008).[3] An "adverse employment action" is "'a significant change in employment status,

---

[3] DCHRA and federal discrimination claims are analyzed under the same legal standard. *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010); *Musgrove v. Gov't of the District of Columbia,* 775 F. Supp. 2d 158, 171–72 (D.D.C. 2011) ("The District of Columbia Court of Appeals . . . "'has made clear that federal case law addressing questions arising in Title VII cases is applicable to the resolution of analogous issues raised regarding DCHRA claims.'" (quoting *Ali v. District of Columbia Gov't,* 697 F. Supp. 2d 88, 92 n.6 (D.D.C. 2010))); *Futrell v. Dep't of Labor Fed. Credit Union,* 816 A.2d 793, 802 (D.C. 2003); *Carney v. Am. Univ.,* 151 F.3d 1090, 1095 (D.C. Cir. 1998); *Howard Univ. v. Green,* 652 A.2d 41, 45 & n.3 (D.C. 1994)). Accordingly, the Court's discussion of the sufficiency of the Title VII discrimination claims applies equally to the sufficiency of the plaintiff's DCHRA claims of discrimination.

such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Baird v. Gotbaum,* 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan,* 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft,* 352 F.3d 422, 426 (D.C. Cir. 2003) ("An [a]dverse employment action . . . [entails a] tangible employment action evidenced by firing, failing to promote, a considerable change in benefits, or reassignment with significantly different responsibilities."). An adverse employment action occurs if an employee "experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C. Cir. 2002).

### C.  McDonnell Douglas Burden-Shifting Framework

The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), set forth a burden-shifting framework to apply in Title VII cases. Under this framework, once the plaintiff has established a *prima facie* case under Title VII, the "burden shifts to the defendant to prove that 'the adverse employment actions were taken for a legitimate, nondiscriminatory reason.'" *Youssef v. FBI,* 687 F.3d 397, 402 (D.C. Cir. 2012) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993)); *see also Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010) (same). Under the *McDonnell Douglas* burden-shifting framework:

> After the employer offers a non-discriminatory justification for its actions, the *McDonnell Douglas* framework falls away, and [the court] must determine whether a reasonable jury "could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff."

*Vickers v. Powell,* 493 F.3d 186, 195 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1289 (D.C. Cir. 1998)); *accord Jones v. Bernanke,* 557 F.3d 670, 678 (D.C. Cir.

2009).  In other words, once an employer produces a legitimate, nondiscriminatory reason for its action, "the sole remaining issue [is] 'discrimination *vel non.*'"  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714 (1983)).  The Supreme Court has made clear that, at the motion to dismiss stage, the question "[is] 'not whether [the plaintiff] will ultimately prevail,' . . . but whether his complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer,* 131 S.Ct. 1289, 1296 (2011) (citation omitted) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

**D.**     **Title VII Retaliation Claims**

"Title VII's anti-retaliation provision makes it unlawful for an employer 'to discriminate against [an] employee . . . because he has opposed any practice' made unlawful by Title VII or 'has made a charge, testified, assisted, or participated in' a Title VII proceeding."  *Steele v. Schafer,* 535 F.3d 689, 695 (D.C. Cir. 2008) (quoting 42 U.S.C. § 2000e–3(a)).  The Court assesses Title VII retaliation claims under the *McDonnell Douglas* burden-shifting framework.  First, the plaintiff must prove a *prima facie* case of retaliation by showing: "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action."  *Hamilton v. Geithner,* 666 F.3d 1344, 1357 (D.C. Cir. 2012) (internal quotation marks omitted).  If the *prima facie* case is made, the defendant must establish that the adverse employment action was taken for a legitimate, nondiscriminatory reason.  *Youssef,* 687 F.3d at 402.  The Court then determines "whether a reasonable jury 'could infer discrimination'" from the plaintiff's pleadings, the defendant's proffered explanation, and any further rebuttal evidence or evidence of discrimination provided by the plaintiff.  *Vickers,* 493 F.3d at 195 (quoting *Aka,* 156 F.3d at 1289).

As to the first element, protected activity encompasses utilizing informal grievance procedures such as complaining to management or human resources about the discriminatory conduct. *Richardson v. Gutierrez,* 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination."); *see also Bell v. Gonzales,* 398 F. Supp. 2d 78, 94 (D.D.C. 2005) ("Initiation of EEO counseling to explore whether an employee has a basis for alleging discrimination constitutes protected activity, even in the absence of an unequivocal allegation of discrimination.").

A plaintiff meets the second element to show a *prima facie* case of retaliation if "a reasonable employee would have found the challenged action materially adverse," meaning that it "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White* ("*Burlington Northern*")*,* 548 U.S. 53, 68 (2006) (internal quotations and citations omitted). Thus, adverse actions giving rise to retaliation claims are broader than for disparate impact claims and are "not limited to discriminatory actions that affect the terms and conditions of employment," but reach any harm that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Baird,* 662 F.3d at 1249 (quoting *Burlington Northern,* 548 U.S. at 68). Yet, the Court in *Burlington Northern* distinguished "materially adverse" actions from "trivial harms," "petty slights," and "minor annoyances." *Burlington Northern*, 548 U.S. at 68. The Court also noted that "[c]ontext matters" and "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69; *see also id.* ("[A]n act that would be immaterial in some situations is material in others.") (citation omitted).

Finally, the third element of the test requiring a causal link between the protected activity and the adverse employment action requires "proof that the desire to retaliate was the but-for

cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). In other words, "traditional principles of but-for causation" apply and the plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 2533.

Significantly, however, even if the plaintiff establishes a *prima facie* case of retaliation, dismissal may still be warranted for failure to state a claim if the defendant shows a legitimate non-discriminatory reason for its actions. *See Broderick v. Donaldson,* 437 F.3d 1226, 1231 (D.C. Cir. 2006). Such a legitimate reason breaks the causal connection between the first two elements and defeats a retaliation claim. Then "the court must simply determine whether the plaintiff has put forward enough evidence to defeat the proffer and support a finding of retaliation." *Bright v. Copps,* 828 F. Supp. 2d 130, 142 (D.D.C. 2011) (citing *Woodruff v. Peters,* 482 F.3d 521, 530 (D.C. Cir. 2007)); *McGrath v. Clinton,* 666 F.3d 1377, 1383 (D.C. Cir. 2012).

## III.    DISCUSSION

The defendants contend that each of the plaintiff's claims are flawed, warranting dismissal of the Complaint. First, PDS asserts that the plaintiff's race and sex discrimination claims are both time-barred and fail to state a cause of action, PDS' Mem. at 5–9. Second, PDS argues that the plaintiff fails to state a claim for retaliation, *id.* at 9–12, and has failed to exhaust his administrative remedies with respect to virtually all of the alleged retaliatory actions he claims, *id.* at 12. Finally, PDS argues that the common law claims are barred by the statute of limitations. *Id.* at 13–14. In addition to adopting all of the grounds for dismissal set out by PDS, Primo's Mem. at 1 n.2, Primo asserts that the case against her should be dismissed for three reasons: first, Primo was not properly served, *id.* at 5–6; second, the DCHRA and common law

claims against her are time-barred, *id.* at 6–7; and, finally, none of the claims for race and sex discrimination or for tortious interference with contractual relations state a cause of action, *id.* at 8–14.  The Court will address the plaintiff's race and sex discrimination claims against both PDS and Primo, his retaliation claims, and, finally, his common law claims, *seriatim*.  For the reasons explained below, the Court dismisses all the plaintiff's claims.[4]

## A.    Gender and Race Discrimination Claims

The plaintiff alleges that he was discriminated against based on his gender under Counts I and IV of his Complaint, and was discriminated against based on his race under Counts II and V of his Complaint.  The plaintiff alleges that he was subject to the following discriminatory treatment based on his gender: (1) he was treated "differently than similarly situated female employees in the terms and conditions of employment, based on unlawful considerations of gender," including "assignment of dangerous and undesirable job duties,"  Compl. ¶¶ 132–33, an example of which is having to serve a subpoena in a residence protected by "a large vicious dog," *id.* ¶¶ 34–35; *see also id.* ¶ 151 (alleging that the plaintiff faced gender discrimination "with respect to the terms, conditions, and privileges of Plaintiff's employment at PDS"); (2) his

---

[4] PDS argues that the plaintiff failed to file a timely opposition to PDS' motion to dismiss the Complaint and that its motion should therefore be granted as conceded.  PDS' Reply Supp. Mot. Dismiss ("PDS' Reply") at 1–2, ECF No. 29.  PDS filed its motion to dismiss on August 12, 2013.  *See generally* PDS' Mem.  The plaintiff requested an extension of time to file an opposition, but the Court struck this motion for failing to comply with Local Civil Rule 7(m) requiring the movant to discuss an anticipated, nondispositive motion with opposing counsel.  *See* 9/13/2013 Minute Order (citing LCvR 7(m)).  The plaintiff never refiled his motion but instead timely filed an opposition to Primo's motion that was styled as a dual opposition to both Primo and PDS' motions to dismiss, and also sought the Court's leave to file an opposition to PDS' motion to dismiss out of time.  *See generally* Pl.'s Opp'n.  The late filing of the opposition more than two months after PDS filed its motion contravenes Local Civil Rule 7(b), requiring all oppositions to be filed within 14 days of service of the opposed motion.  *See* LCvR 7(b).  Further, the plaintiff's opposition-cum-motion failed to comply with Federal Rule of Civil Procedure 7(b) requiring such requests for leave to file out of time be made by motion, not merely referenced in opposition papers.  *See* FED. R. CIV. P. 7(b).  Nevertheless, the Court is mindful that *pro se* litigants are given "more latitude" than those who are represented by counsel.  *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding *pro se* complaints to "less stringent standards than formal pleadings drafted by lawyers"); *Moore v. Agency for Int'l Dev.*, 994 F.2d 874, 876 (D.C. Cir. 1993) (allowing *pro se* litigant opportunity to perfect service).  Federal appellate courts, including the D.C. Circuit, will go to "'particular pains' to protect pro se litigants against the consequences of technical errors if injustice would otherwise result." *Childers v. Slater*, 197 F.R.D. 185, 188 (D.D.C. 2000) (allowing *pro se* litigant to reopen discovery to avoid injustice).  Accordingly, the Court grants the plaintiff's "motion" to file an opposition to PDS' motion to dismiss *nunc pro tunc* and will consider the opposition in deciding the instant motions.

supervisors tolerated, without reprimand, sexually demeaning comments by his supervisor Primo, *id.* ¶¶ 19, 21, 32, and Primo improperly "slapp[ing] Plaintiff in the crouch [sic]," *id.* ¶ 40.

The plaintiff alleges he faced race-based discrimination because PDS: (1) "treated Plaintiff differently than similarly situated employees in the terms and conditions of employment, based on unlawful consideration of race," *id.* ¶ 141; and (2) tolerated Primo's racist comments despite the plaintiff's complaints, *id.* ¶¶ 19, 28, 38. The plaintiff additionally alleges discrimination based on both his race and gender based on PDS: (1) failing to investigate and take corrective action regarding the plaintiff's complaints of race and gender discrimination, *id.* ¶¶ 153, 163; (2) placing the plaintiff on leave and terminating him, *id.* ¶¶ 154–55, 165; (3) denying the plaintiff admission into an investigator certification program that PDS administered, *id.* ¶¶ 119–21; and (4) not hiring the plaintiff for open positions at PDS as a staff investigator or an eligibility examiner, *id.* ¶¶ 122–25.[5]

In response to the plaintiff's race and gender discrimination claims, PDS argues, first, that any "on-the-job discrimination" is time-barred under Title VII because the plaintiff "had been placed on leave *before*" June 19, 2009, which is 300 days before the plaintiff filed his EEO complaint, PDS' Mem. at 7 (emphasis added); and, second, that the plaintiff has failed to allege a causal link between these acts and the plaintiff's race or gender, *id.* at 8. In addition, although not an argument raised by the defendants, many of the alleged acts underlying the plaintiff's discrimination are simply not adverse employment actions under either Title VII or the DCHRA.

---

[5] The plaintiff states that he was subject to a number of other acts of discrimination, but these are all related to the plaintiff's suspension as they are all consequences that flow from being suspended. These include "block[ing] Plaintiff from his PDS email account and delet[ing] all of his emails," Compl. ¶ 92, "bann[ing] Plaintiff from PDS premises," *id.* ¶ 93, "bann[ing] Plaintiff from working on any cases," *id.* ¶ 94, "bann[ing] Plaintiff from communicating with any PDS employees," *id.* ¶ 95, "bann[ing] Plaintiff from using any of PDS's databases," *id.* ¶ 96, and bann[ing] Plaintiff from using his PDS identification," *id.* ¶ 97. Such acts are considered by the Court not as individual discriminatory acts, but as the characteristics of a suspension. The Court similarly considers the plaintiff's claim that PDS "revoked Plaintiff's authority to properly carry out his job . . . [and] undermine[d] his position at PDS" as a reference to his suspension and termination, which the Court considers below, rather than as independent acts of discrimination. *Id.* ¶ 107.

1.      *Most Alleged Discriminatory Actions Occurring While Plaintiff Was On-the-Job Are Time-Barred And Not Adverse Employment Actions*

At the outset, the plaintiff does not dispute that, in the District of Columbia, the filing period for an EEO charge is 300 days.  Pl.'s Opp'n at 2 (assuming, without disputing, that "the charge filing period in this case began on June 19, 2009").  While Title VII requires "aggrieved persons" to file a charge with the EEOC within 180 days after the alleged unlawful employment practice occurred, this period is extended to 300 days when the person has initially instituted a procedure with a state or local agency.  42 U.S.C. § 2000e-5(e)(1).  A "work-sharing" arrangement between the EEOC and the District of Columbia Office of Human Rights ("DCOHR") deems timely-filed EEO charges as cross-filed with the DCOHR, making the deadline for filing EEO charges in the District of Columbia under Title VII 300 days from the date of the alleged discrimination.  *Peters*, 873 F. Supp. 2d at 197; *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 6 (D.D.C. 2011) ("In the District of Columbia, an EEOC charge must be filed within 300 days of the date of the alleged discrimination."); *Ellis v. Georgetown Univ. Hosp.*, 631 F. Supp. 2d 71, 78 (D.D.C. 2009) ("When a charge of discrimination is filed with the EEOC in the District of Columbia, a claim is automatically cross-filed with the D.C. Office of Human Rights ("DCOHR") pursuant to a 'worksharing agreement' between the two agencies.") (*citing Carter v. George Washington Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004)).  This limitations period requirement is one of "the prerequisites that a plaintiff must satisfy before filing suit."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002); *see also Singletary v. District of Columbia*, 351 F.3d 519, 522–23 & n.4 (D.C. Cir. 2003); *Currier v. Radio Free Europe/Radio Liberty, Inc.*, 159 F.3d 1363, 1366 & n.2 (D.C. Cir. 1998); *Smith-Thompson v. District of Columbia*, 657 F. Supp. 2d 123, 131 (D.D.C. 2009) (employee claiming

discrimination under Title VII must comply with this timing requirement "or lose the ability [to] recover for it.").

In this case, because the plaintiff filed his first EEO charge on April 15, 2010, only allegedly discriminatory acts occurring after June 19, 2009 are timely for consideration of his race and gender discrimination claims, and any allegations describing conduct that occurred earlier than that date are time-barred. The plaintiff was put on administrative leave on June 11, 2009, one week before the limitations period began. *See* Compl. ¶ 99; Koerner Decl. Ex. 1 (PDS Letter, dated June 11, 2009, advising plaintiff that he was placed on administrative leave with pay). Consequently, none of the alleged acts that occurred while he was at work, before his suspension, are timely to support his discrimination claims, leaving only his claims regarding his suspension and termination as a basis for his race and gender claims.[6]

In any event, even if not time-barred, the litany of allegedly discriminatory acts described in the Complaint as occurring during the plaintiff's year of in-person employment do not constitute adverse employment actions. First, as "offensive and repugnant" as his supervisor's verbal comments may have been to the plaintiff, Compl. ¶ 33, this conduct does not amount to an adverse employment action. *See, e.g.*, *Taylor v. FDIC*, 132 F.3d 753, 764 (D.C. Cir. 1997) (noting that "[c]ourts applying Title VII have consistently focused on 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating . . . [and not] interlocutory or mediate decisions having no immediate effect upon employment conditions.'"); *Stewart v. Evans,* 275 F.3d 1126, 1135 (D.C. Cir. 2002) (no adverse employment action where

---

[6] The Court notes that the plaintiff cannot allege a discrimination claim under Title VII for his first suspension, as this occurred on June 11, 2009, eight days before the initiation of the 300-day filing period under Title VII, and is therefore untimely. Nevertheless, the plaintiff may still be able to state a claim on the basis of his first suspension under the DCHRA, which, as explained more fully below, permits plaintiffs to file suit based on claims that occur one year prior to the filing of a complaint. *See infra* Part III.B.3. The Court will thus consider the plaintiff's first suspension solely with respect to any race or gender discrimination claim under the DCHRA, not Title VII.

there was no change in position, benefits, or pay grade); *Weng v. Solis*, 960 F. Supp. 2d 239,

249–50 (D.D.C. 2013) (holding that "offensive racial, ethnic and/or sexually charged slurs,

comments, and jokes by OED management" are not "adverse employment actions within the

meaning of Title VII"). "'[M]ere utterance of an . . . epithet which engenders offensive feelings

in an employee' does not sufficiently affect the conditions of employment to implicate Title

VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing *Meritor Savs. Bank, FSB v.*

*Vinson,* 477 U.S. 57, 67 (1986)); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88

(1998) (finding that "simple teasing, offhand comments, and isolated incidents (unless extremely

serious) will not amount to discriminatory changes in the "'terms and conditions of

employment'") (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)

(citation omitted)); *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005) (same); *Bowden v.*

*Clough*, 658 F. Supp. 2d 61, 80 (D.D.C. 2009) (same). Indeed, "the D.C. Circuit has repeatedly

emphasized that 'casual or isolated manifestations of a discriminatory environment, such as a

few ethnic or racial slurs, may not raise a cause of action.'" *Goode v. Billington*, 932 F. Supp. 2d

75, 89 (D.D.C. 2013) (quoting *Park v. Howard Univ.,* 71 F.3d 904, 906 (D.C. Cir. 1995)

(internal quotation marks omitted).

Furthermore, while the plaintiff complains about being required to perform tasks that he

considered "dangerous, unsafe and undesirable," Compl. ¶ 34, nowhere does he deny that these

tasks were part of his employment responsibilities and, therefore, being required to perform his

job cannot and does not amount to discrimination. *See, e.g.*, *Mungin v. Katten Muchin & Zavis*,

116 F.3d 1549, 1556–57 (D.C. Cir. 1997) (finding that, "changes in assignments or work-related

duties do not ordinarily constitute adverse employment decisions if unaccompanied by a

decrease in salary or work hour changes"); *Stewart*, 275 F.3d at 1135 (holding that "minor

changes in work-related duties or opportunities do not constitute an actionable injury unless they are accompanied by some other adverse change in the terms, conditions, or privileges of employment"); *Bowden*, 658 F. Supp. 2d at 82 (finding that plaintiff failed to state a claim for discrimination based on being "given extra tasks, including heavy lifting" in relation to his female counterparts in part because all employees "must perform some lifting" and "the tasks among all [co-workers] vary according to their skill and experience"); *Koch v. Schapiro*, 759 F. Supp. 2d 67, 75–76 (D.D.C. 2011) (holding that increased workload that was within scope of job responsibilities was non-discriminatory). Indeed, "'[n]ot everything that makes an employee unhappy is an actionable adverse action under Title VII.'" *Rhodes v. Chertoff*, No. 04-1715, 2005 WL 3273566, at *6 (D.D.C. Aug. 4, 2005) (quoting *Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir. 1996)). Courts have made clear that "Title VII is not a 'general civility code' for the workplace, and it does not redress 'the ordinary tribulations of the workplace, such as sporadic use of abusive language.'" *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 80 (D.D.C. 2007) (citing *Oncale*, 523 U.S. at 80, and *Faragher*, 524 U.S. at 788) (internal citations omitted).

Finally, the plaintiff cites an incident in which his supervisor Primo "slapped Plaintiff in the crouch [sic]," as evidence of gender discrimination. Compl. ¶ 40. This gesture may very well constitute an unwelcome, and consequently, inappropriate contact, but the context for this contact belies its import as a basis for a discrimination claim. As the plaintiff describes the contact, his supervisor was walking towards the plaintiff in a public hallway, raised her hand "as if to give Plaintiff a 'high five' as she sometimes did," and then, "before their hands met Primo abruptly and without warning slapped Plaintiff in the crouch [sic]." *Id*. The plaintiff clearly understood this hand-action to be a "tease" and noted that "[e]very time Primo would do this Plaintiff would flinch and Primo would laugh." *Id*. While being the brunt of such a schoolyard

trick may be unpleasant, this does not amount to an adverse employment action that resulted in a modification of any material term of the plaintiff's employment. *See Faragher*, 524 U.S. at 787–88 (finding that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the "'terms and conditions of employment'") (citing *Oncale*, 523 U.S. at 82 (citation omitted)); *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1124 (D.C. Cir. 2002) (citing *Johnson v. Hondo, Inc.,* 125 F.3d 408, 412 (7th Cir. 1997)) (applying *Johnson* court's analysis that "[m]ost unfortunately, expressions [that employ obscene language] are commonplace in certain circles," and "they are simply expressions of animosity or juvenile provocation," even if accompanied by "a crotch-grabbing gesture"); *Walker v. Washington Metro. Area Transit Auth.*, 102 F. Supp. 2d 24, 29 (D.D.C. 2000) (citing *Henry v. Guest Servs., Inc.,* 902 F. Supp. 245, 251–52 (D.D.C. 1995) (holding that management personnel jokes directed at the plaintiff's depression were not severe enough to constitute adverse employment action), *aff'd,* 98 F.3d 646 (D.C. Cir. 1996)).

The only timely adverse employment actions the plaintiff has plead are his suspension and termination.[7] *See Baird,* 662 F.3d at 1248 (An adverse employment action is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" (quoting *Douglas,* 559 F.3d at 552)); *Taylor*, 132 F.3d at 764 ("Courts applying Title VII have consistently focused on 'ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating . . . [and not] interlocutory or mediate decisions

---

[7] Although failure-to-hire may constitute an adverse employment action, the plaintiff has failed to plead facts sufficient to sustain such a claim based on his allegation that PDS did not hire him for two open positions. Compl. ¶¶ 122–25. Such failure-to-hire cases must allege that the position applied for "remained open; and that the employer continued to seek applicants from persons of complainant's qualifications." *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006) (citing *Stella v. Mineta,* 284 F.3d 135, 145 (D.C. Cir. 2002)); *Carter*, 387 F.3d at 878 (quoting *McDonnell Douglas,* 411 U.S. at 802)) (same). The plaintiff has failed to allege this in his Complaint and, thus, does not state a claim based on these acts. Consequently, the allegations regarding the failure to hire the plaintiff cannot form the basis of his discrimination claim.

having no immediate effect upon employment conditions.'"). With this clarification of which of the plaintiff's myriad of complaints about his PDS employment raise sufficient and timely allegations of adverse employment actions, the Court next turns to an analysis of the sufficiency of the plaintiff's claims that these actions were taken due to his gender and race. The Court looks first to the causal link in the plaintiff's gender discrimination claim, then his race discrimination claim.

<blockquote>2. <em>Insufficient Pleading of Causal Link Between Plaintiff's Suspension/Termination and His Male Gender</em></blockquote>

The plaintiff has failed to plead sufficient facts to demonstrate that he was suspended or terminated because of his male gender for two reasons. First, there is nothing to support a causal inference that gender was PDS' motivating factor, other than the plaintiff's conclusory allegations. *See* Compl. ¶ 151 ("PDS . . . discriminated against Plaintiff on account of his gender"); *id.* ¶ 129 ("Plaintiff's gender has continually been a motivating factor in Defendant's . . . discriminatory treatment"). Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" at the pleading stage and cannot sustain the plaintiff's discrimination claim. *Iqbal,* 556 U.S. at 678. Further, the plaintiff specifically pleads that adverse employment actions were taken against him, not on the basis of his gender, but because of his protected EEO activity. *See* Compl. ¶¶ 92–98 (the plaintiff claims that he was first suspended "[i]n retaliation for Plaintiff's complaints about EEO violations"); *id.* ¶ 102 (the plaintiff was suspended without leave "[i]n retaliation for Plaintiff's complaints about EEO violations"). These allegations do not establish that the plaintiff was discriminated against because of his gender. Rather, as the plaintiff himself pleads, these acts were allegedly taken because of his complaints, a matter which the Court addresses under the discussion of the

plaintiff's retaliation charges below.  These allegations are insufficient to support a causal inference that his suspension and/or termination were due to his gender.

Second, to the extent the plaintiff attempts to establish gender discrimination based on disparate treatment, the plaintiff's Complaint still falls short.  The plaintiff must show that, by contrast to how women were treated by PDS, he was treated differently because of his gender. *See Staropoli v. Donahoe*, 923 F. Supp. 2d 10, 20 (D.D.C. 2013), *aff'd*, No. 13-5070, 2013 WL 4711669 (D.C. Cir. Aug. 2, 2013).  The plaintiff has not done so.  The plaintiff's only allegation of disparate treatment is that he was fired "on the pretext that he was 'vulnerable to being impeached upon testifying'" because of the charges against him arising from the May 30, 2009 car accident, *id.* ¶¶ 104, 108, but, in comparison, Primo was not terminated despite having a prior conviction on her record, *see id.* ¶ 115.  This comparison is unavailing because the plaintiff also alleges that a male colleague continued to be employed by PDS despite having a conviction on his record, *id.* ¶ 116, a fact which undercuts the plaintiff's allegation that PDS discriminates against males.  The plaintiff's Complaint, thus, does not plead facts to show differential treatment based on gender.

Accordingly, the plaintiff's gender discrimination claims against PDS in Counts I and IV, under Title VII and the DCHRA, respectively, are dismissed.

3. *Insufficient Pleading of Causal Link Between Plaintiff's Suspension/Termination and His Unspecified Race*

The plaintiff has failed to plead a *prima facie* case of race discrimination for two reasons. First, nowhere in the Complaint does the plaintiff establish his own race or that of several of his supervisors.  *See generally* Compl.  *See also McManus v. District of Columbia*, 530 F. Supp. 2d 46, 76 (D.D.C. 2007) (dismissing plaintiffs' Title VII claims because plaintiffs "do not even state their individual races" thereby "do not allege that they are members of any of the classes

protected by that statute").  While not apparent from the plaintiff's pleading, his EEO complaint

states that the plaintiff identifies as "American Indian/White," Koerner Decl. Ex. 2, and the

Complaint indicates that he has a "familial relationship with his African-American uncle and

cousins." Compl. ¶ 43.  Yet nowhere does the plaintiff clarify the race of which he is actually a

member.  By omitting a statement of the plaintiff's race in his Complaint, the plaintiff has failed

to allege the most basic fact necessary to plead a claim under Title VII—namely, that he is a

member of a protected class.  *See* 42 U.S.C. § 2000e–2(a)(1) (making it unlawful for an

employer to discriminate against any individual "because of such individual's race, color,

religion, sex, or national origin").

Second, even if the plaintiff had identified his race, his claim would still fail because he

has failed to plead that he was suspended and terminated because of his race.  As with his gender

discrimination claims, the plaintiff relies on conclusory assertions to assert that "Plaintiff's race

has continually been a motivating factor in Defendant's wrongful and discriminatory treatment,"

Compl. ¶ 137, and that he was differently treated "than similarly situated employees . . . based on

unlawful considerations of race," *id.* ¶ 141.  Such statements are "'naked assertion[s]' devoid of

'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557), and

do not satisfy the requirement to plead a *prima facie* case of race discrimination.  The Complaint

is devoid of any allegations that would bolster the conclusory assertion that the plaintiff's

suspension and termination were motivated by his race.  *See generally* Compl.  Indeed, the

plaintiff avers that these acts were taken "[i]n retaliation for Plaintiff's complaints about EEO

violations," not based on his race.  *See* Compl. ¶¶ 92–98, 102.  To the extent the plaintiff intends

to establish a causal link by showing disparate treatment, the Court cannot engage in such an

analysis without knowing the plaintiff's race, or the race of the parties he compares himself to.

Consequently, the plaintiff has failed to state a claim of employment discrimination based on his race.

Accordingly, the plaintiff's race discrimination claims against PDS in Counts II and V, under Title VII and the DCHRA, respectively, are dismissed.[8]

### 4. *Race and Gender Discrimination Claims against Primo Similarly Fail*

The plaintiff alleges in Counts VII and VIII that Primo discriminated against the plaintiff based on his gender and race in violation of the DCHRA. Compl. ¶¶ 181–94. The plaintiff further claims that Primo "aided and abetted the PDS's discrimination against Plaintiff on account of his gender [and race], during the course of his employment." Compl. ¶¶ 182, 189. Primo argues that these claims are barred because the plaintiff: (1) failed to execute proper service as to Primo, Primo's Mem. at 5–6; (2) failed to file an EEO complaint against Primo and limited that complaint to PDS, rendering his claims against Primo time-barred, *id.* at 6–7; and (3) failed to state a claim for discrimination, *id.* at 8–9. The Court agrees that the plaintiff has failed to allege a *prima facie* case of discrimination, thus, dismisses the plaintiff's race and gender discrimination claims against Primo without reaching Primo's first[9] and second argument.[10]

---

[8] In addition, as discussed in Part III.C.2, *infra*, under the *McDonnell Douglas* framework, PDS has presented unrefuted evidence of a legitimate, nondiscriminatory basis for the adverse employment actions taken against the plaintiff due to his conduct in connection with the May 30, 2009 car accident and his subsequent criminal conviction. Having considered the plaintiff's failure to plead a *prima facie* case, the plaintiff's failure to rebut PDS' "proffered explanation for its actions," and the lack of further evidence of discrimination by PDS, PDS' proffered reason is sufficient to defeat the plaintiff's claims of discrimination on the basis of both his male gender and unspecified race. *Vickers,* 493 F.3d at 195 (quoting *Aka,* 156 F.3d at 1289).

[9] Primo contends that the plaintiff failed to file a copy of the waiver of service as to Primo and thereby failed to perfect service under Federal Rule of Civil Procedure 4, with the result that this Court does not have jurisdiction over Primo. Primo's Mem. at 5–6. Although the plaintiff did not file proof of service, the Court granted the plaintiff's motion for an extension of time to file Primo's waiver of service form *nunc pro tunc* on October 16, 2013, after Primo filed her motion to dismiss. *See* 10/16/2013 Minute Order. Although the plaintiff has yet to file the waiver of service form, in this Circuit, "[p]ro se litigants are allowed more latitude than litigants represented by counsel to correct defects in service of process and pleadings." *Moore,* 994 F.2d at 876. Moreover, courts in this jurisdiction have concluded that "dismissing the [pro se] plaintiffs' suit for insufficient service of process would be improper." *Anderton v. United States,* No. 06-129, 2008 WL 2510626, at *2 (D.D.C. Apr. 28, 2008) (citing *Lindsey v. United States,* 448 F. Supp. 2d 37, 47 (D.D.C. 2006)); *accord Cruz-Packer v. District of Columbia,* 539 F. Supp. 2d 181, 188 (D.D.C. 2008). Courts have denied a defendant-employee's motion to dismiss for failure to serve

"Courts have held individuals liable under the DCHRA when they were personally involved in the discriminatory conduct . . . or when they aided or abetted in the discriminatory conduct of others." *King v. Triser Salons, LLC*, 815 F. Supp. 2d 328, 331–32 (D.D.C. 2011) (internal citations omitted). Nonetheless, a DCHRA discrimination claim against an individual must still meet the requirements of timeliness and qualify as an adverse employment action. For the same reasons discussed in Part III.A.1 above, other than the plaintiff's suspension and termination, the plaintiff has not alleged any timely adverse employment actions that Primo has personally taken against the plaintiff.[11] Indeed, while the plaintiff alleges that Primo used crude and offensive language in the plaintiff's presence, *see, e.g.*, Compl. ¶¶ 25, 26, 30, and engaged in other unbecoming conduct, *see, e.g.*, *id.* ¶ 36, 40, such actions are not "the kind of material harm that the DCHRA demands" to establish an adverse employment action. *Dickerson v. SecTek,*

---

process where the employer was properly served, the plaintiff was *pro se*, and it was "clear . . . that defendants ha[d] received notice of this suit and they did in fact respond with this motion to dismiss." *Jarrell v. Tisch*, 656 F. Supp. 237, 239–40 (D.D.C. 1987) (concluding that "dismissal of the case for insufficient process [was] unwarranted." (citing *Dixon v. Stephenson, Inc.,* 614 F. Supp. 60 (D.D.C. 1985))); *see also Kidwell v. FBI*, 813 F. Supp. 2d 21, 27–28 (D.D.C. 2011) (evaluating *pro se* plaintiff's claims on motion to dismiss under Rule 12(b)(6) "[b]efore turning to the question of" sufficient service of process because complaints may be dismissed under Federal Rule of Civil Procedure 12(b)(6) *sua sponte* (citing *Best v. Kelly,* 39 F.3d 328, 331 (D.C. Cir. 1994) (internal quotations omitted))). As explained below, because the Court concludes that the plaintiff has failed to state a race or gender discrimination claim against Primo, resolution of the plaintiff's Rule 4 defense is not necessary.

[10] Primo further contends that because the plaintiff did not file an EEO complaint against her individually, only against PDS, the plaintiff's claims are time-barred by the DCHRA's one-year statute of limitations. *See* Pl.'s Mem. at 6–7. Primo's statute of limitations defense is an affirmative defense, *Colbert v. Potter*, 471 F.3d 158, 165 (D.C. Cir. 2006) (timeliness is affirmative defense under Title VII); *Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 734 (D.C. 2000) (timeliness is affirmative defense under DCHRA), and, thus, is not jurisdictional, *Feldman v. Gogos*, 628 A.2d 103, 104 (D.C. 1993) (finding that "a statute of limitations erects no jurisdictional bar"). Consequently, courts may consider other grounds for dismissal, such as failure to state a claim, before addressing the statute of limitations arguments. *See Johnson v. Interstate Mgmt. Co., LLC*, 962 F. Supp. 2d 244, 252 (D.D.C. 2013) (finding that court "need not consider the timeliness of" dismissal harassment, hostile work environment, and age discrimination claims because court had already dismissed them on other grounds); *United States v. Regenerative Sciences, LLC*, 878 F. Supp. 2d 248, 262 n.12 (D.D.C. 2012) (finding that a court may properly dismiss suit for failure to state a claim before reaching statute of limitations defense). As further explained below, because the Court concludes that the plaintiff has failed to state any discrimination claims against Primo, resolution of Primo's statute of limitations defense is not necessary.

[11] The plaintiff separately claims that Primo "creat[ed] a hostile and intolerable environment" for the plaintiff, Compl. ¶¶ 182, 189, a charge addressed in the discussion of the plaintiff's hostile work environment claims in Part III.B, *infra*.

*Inc.*, 238 F. Supp. 2d 66, 74–75 (D.D.C. 2002).  Moreover, the plaintiff does not allege that Primo had sufficient authority, even as his supervisor, to "affect[] a term, condition, or privilege of [the plaintiff's] employment" to amount to an adverse employment action.  *See Jones v. GlaxoSmithKline, LLC*, 755 F. Supp. 2d 138, 149 (D.D.C. 2010); *see generally* Compl.  In any event, even if Primo were somehow involved in the decisions to suspend and terminate the plaintiff, for the same reasons discussed in Parts III.A.2 and 3 above, the plaintiff has failed to allege any causal link between these adverse employment actions and the plaintiff's race or gender.

To the extent the plaintiff seeks to establish Primo's liability based on a theory that she aided and abetted PDS, Primo still cannot be held liable because the Court has found that PDS' actions were not discriminatory.  Consequently, Primo cannot be liable for aiding and abetting any discriminatory acts when the Court has found that no discriminatory acts occurred.  *See Gaujacq v. EDF, Inc.*, 601 F.3d 565, 576 (D.C. Cir. 2010) (holding that "because [employer] did not discriminate against [plaintiff], it is clear that [supervisor] did not aid and abet any unlawful discrimination" (citing *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983))); *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 888 (D.C. 1998) (finding that "*if* [firm] unlawfully discriminated against the plaintiff as alleged, *then* the partners who carried out the allegedly discriminated acts aided and abetted the employer's discrimination") (emphasis added). Thus, no aiding and abetting theory against Primo can be alleged as there is no underlying discrimination.

Accordingly, the plaintiff's race and gender discrimination claims against Primo under Counts VII and VIII under the DCHRA are dismissed.

## B.    Hostile Work Environment Claim

The plaintiff does not specifically plead a hostile work environment claim as a separate count in his Complaint. *See generally* Compl. ¶¶ 127–214. Yet, many of the factual allegations listed in the plaintiff's Complaint appear to suggest such a claim against either or both defendants. Consequently, the Court will address the sufficiency of any hostile work environment claims based upon the allegations in the Complaint. The plaintiff alleges that he complained to PDS of "hostile treatment on the basis of his gender, and or race," *id.* ¶ 75, that the treatment in his workplace "creat[ed] a hostile and intolerable environment," *id.* ¶¶ 151, 171, and that PDS did not remedy his "harassing and discriminatory working environment," *id.* ¶ 172. He further claims that Primo "creat[ed] a hostile and intolerable environment" for the plaintiff. *Id.* ¶¶ 182, 189. The underlying conduct described by the plaintiff to support his hostile work environment allegations are: (1) sexually graphic or crude language by Primo, *id.* ¶¶ 23–27, 30, 38, 39; (2) inappropriate workplace behavior by Primo, *id.* ¶ 78, including three occasions over the course of a year when Primo allegedly "expos[ed] her buttocks to the plaintiff," *id.* ¶ 36, and one occasion when Primo "slapped Plaintiff in the crouch [sic]" after gesturing "as if to give the plaintiff a 'high five,'" *id.* ¶ 40; and (3) PDS' failure to intervene, *id.* ¶¶ 21, 38, 75. PDS responds that any hostile work environment claim the plaintiff asserts "cannot establish a claim for race or gender discrimination" because "none of the [alleged] incidents occurred within the filing period" for a Title VII claim. PDS' Mem. at 7. Primo adds that the plaintiff has failed to state a claim because he has failed to allege his race, Primo Mem. at 9, and that the acts described are not severe or pervasive enough to establish a hostile work environment claim, *id.* at 9–11. The Court agrees that any hostile work environment claim under Title VII is time-barred, and that the plaintiff has failed to plead a *prima facie* hostile work environment claim under the

DCHRA because he has failed to link any hostile work environment to any protected class of which he may be a member.

1.    *Requirements For Hostile Work Environment Claim*

Although not explicitly mentioned in Title VII, the law is long-standing that this statute provides a cause of action for a discriminatory hostile work environment.  *See Meritor Savs. Bank, FSB*, 477 U.S. at 73.  A work environment is considered "hostile" in the employment discrimination context when it is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Oncale,* 523 U.S. at 78 (quoting *Harris,* 510 U.S. at 21); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *Baloch,* 550 F.3d at 1201.  For the Court to consider a hostile work environment claim, the plaintiff must establish a *prima facie* case by showing:

> (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome[] harassment . . . ; (3) the harassment complained of was based upon [the plaintiff's protected status]; (4) the charged [] harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment . . . ; and (5) the existence of respondeat superior liability.[12]

*Davis*, 275 F.3d at 1122–23 (quoting *Yeary v. Goodwill Industries–Knoxville, Inc.,* 107 F.3d 443, 445 (6th Cir. 1997)); *Whiting v. Labat-Anderson, Inc.*, 926 F. Supp. 2d 106, 116 (D.D.C. 2013)

---

[12] When a supervisor with immediate or successively higher authority created or contributed to the alleged hostile work environment, "an employer is subject to vicarious liability to a victimized employee," subject to an affirmative defense about the reasonableness of the employer's conduct as well as that of the victim, "[w]hen no tangible employment action is taken." *Faragher*, 524 U.S. at 807.  Thus, for hostile work environment claims involving the conduct of a supervisor, the plaintiff need not allege as an element of the claim that the employer knew, or should have known, of the harassment and failed to take action to prevent further harassment.  *See Curry v. District of Columbia,* 195 F.3d 654, 659 (D.C. Cir. 1999) ("Every circuit that has addressed co-worker harassment in the 'post-Faragher era' has distinguished the standard applicable to co-worker harassment from that governing harassment by a supervisor, applying to the former a variation of the negligence standard the circuit had applied pre-Faragher."); *Watts v. Kroger Co*., 170 F.3d 505, 509 (5th Cir. 1999).

(same).[13]  "The key terms, then, are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment."  *Jones,* 755 F. Supp. 2d at 149 (quoting *Lester v. Natsios,* 290 F. Supp. 2d 11, 22 (D.D.C. 2003)); *see also Peters,* 873 F. Supp. 2d at 188–89; *Turner v. Shinseki,* 824 F. Supp. 2d 99, 123–24 (D.D.C. 2011); *Dorns v. Geithner,* 692 F. Supp. 2d 119, 135–36 (D.D.C. 2010) (citing *Hendricks v. Paulson,* 520 F. Supp. 2d 65, 89 (D.D.C. 2007)); *Roberson v. Snow,* 404 F. Supp. 2d 79, 89–90 (D.D.C. 2005).

To determine whether a work environment is sufficiently "hostile" to support a claim, the Court must look at the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris,* 510 U.S. at 23.  "[C]onduct must be extreme to amount to a change in the terms and conditions of employment . . . ."  *Faragher,* 524 U.S. at 788.  "[N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable."  *Stewart,* 275 F.3d at 1133 (citations and quotation marks omitted).  "[C]asual or isolated manifestations of a discriminatory environment . . . may not raise a cause of action."  *Park,* 71 F.3d at 906 (quoting *Bundy v. Jackson,* 641 F.2d 934, 943 n.9 (D.C. Cir. 1981)).

In other words, not all forms of workplace harassment are prohibited, only harassment based on a person's membership in a protected class.  *See, e.g.*, *Stewart,* 275 F.3d at 1133. Indeed, courts have routinely held that hostile behavior, no matter how unjustified, cannot support a hostile work environment claim unless that behavior is linked to the plaintiff's

---

[13] Although the D.C. Circuit has applied this five-part test in the context of a hostile work environment based on gender, the Court did not expressly limit this criteria to claims of gender discrimination.  *See Davis*, 275 F.3d at 1122–23 (listing the five-part test as the requirement "to make a prima facie Title VII hostile environment claim"). As explained below, even if solely applicable to hostile work environment claims for gender discrimination, this standard is nevertheless applicable because the Court only applies it to the plaintiff's allegation of a hostile work environment based on his gender, as the plaintiff's race-based claims are resolved on other grounds.

membership in a protected class.  *See Na'im v. Clinton,* 626 F. Supp. 2d 63, 73 (D.D.C. 2009); *Kline v. Springer,* 602 F. Supp. 2d 234, 243 (D.D.C. 2009), *aff'd, Kline v. Berry,* 404 Fed. Appx. 505 (D.C. Cir. 2010).

2.      *Any Hostile Work Environment Claim Under Title VII Is Untimely*

As noted in Part III.A.1, the plaintiff did not file his EEO complaint until April 15, 2010, 308 days after he was first suspended and placed on administrative leave, on June 11, 2009. During his suspension, the plaintiff was no longer allowed on PDS premises, Compl. ¶ 93, and could not communicate with any PDS employees other than a supervisor who was not Primo, Compl. (unredacted) ¶ 95.  In other words, after his suspension, the plaintiff was not permitted to be exposed to his work environment.  Thus, the plaintiff's allegations concerning hostile activity at his workplace are time-barred under Title VII because the plaintiff was not exposed to a hostile work environment within three hundred days of the filing of his EEO complaint.

For hostile work environment claims, at least one "act contributing to the claim [must] occur[] within the filing period" for the court to consider "the entire time period of the hostile environment" for the purposes of determining liability.  *See Morgan*, 536 U.S. at 117.  Here, the plaintiff has failed to allege any act contributing to his claim within the filing period. Furthermore, the plaintiff has not alleged any incidents contributing to any hostile work environment claim after he was suspended.

To avoid this conclusion, the plaintiff responds that two statements in his Complaint sufficiently allege acts of discrimination within the filing period.  First, he claims employment with PDS "until March 2010," when he was terminated, and that "although [he was] occasionally on leave, [he] was required to work on cases for PDS and receive emails from Defendant Primo through his PDS email account well after [] June 19, 2009," the date of his suspension.  Pl.'s Opp'n at 3.  Second, he alleges that Primo used offensive terms "in person and by email every

31

day he was employed by PDS." *Id.* (citing Compl. ¶ 30). The plaintiff extrapolates from these two statements to reason that he has sufficiently plead that an act of discrimination occurred within the filing period because he has stated that Primo used offensive terms "every day he was employed," and he was at least formally employed within 300 days of his EEOC filing.

The plaintiff's strained reasoning fails to save the timeliness under Title VII of any hostile work environment claim for two reasons. First, his argument directly contradicts his own pleadings. The plaintiff was placed on administrative leave on June 11, 2009, the conditions of which prevented the plaintiff from "us[ing] PDS equipment, databases, and email accounts" or "participat[ing] in any PDS case." *See* Koerner Decl. Ex. 1. The plaintiff confirms this in his Complaint, alleging that he was "banned . . . from the PDS premises . . . from working on any PDS cases . . . [or] using any of PDS's databases," *id.* ¶¶ 93–94, 96, and "banned . . . from communicating with any PDS employees other than" a supervisor who was not Primo, Compl. (unredacted) ¶ 95. Indeed, these alleged acts suspending the plaintiff from the PDS workplace form part of the plaintiff's discrimination and retaliation claims. *See id.* ¶¶ 92–98 (alleging that PDS undertook these measures "in retaliation for Plaintiff's complaints about EEO violations"). The plaintiff's present assertion of continuous contact with Primo until his formal termination not only contradicts his own Complaint, but also would have violated the terms of his suspension, rendering his argument in his opposition motion less than credible. *See* Koerner Decl. Ex. 1. Thus, the plaintiff's assertion that he continued to use PDS email and enter the PDS workplace to be exposed to Primo's conduct during the filing period is unavailing in the face of the contradictory allegations in his own Complaint and the documentary evidence referenced in his Complaint.

Second, the plaintiff cannot base his claims on technicalities. The Court must evaluate the Complaint under *Twombly*'s plausibility standard. *Twombly,* 550 U.S. at 570 (a plaintiff must "nudge[ ] [his or her] claims across the line from conceivable to plausible."). It is simply not plausible, based on the plaintiff's own allegations, for the Court to conclude that the plaintiff was exposed to hostility in his work environment after he was suspended. Consequently, if the plaintiff could not access the workplace after his suspension, an act of discrimination could not have occurred within the filing period. *See Morgan*, 536 U.S. at 122 (holding that hostile work environment claim is time barred unless "at least one act falls within the" Title VII filing period). Accordingly, any hostile work environment claims under Title VII against PDS or Primo must be dismissed.

3.  *The Plaintiff Fails To State Any Hostile Work Environment Claim Under The DCHRA*

By contrast to the filing period for hostile work environment claims under Title VII, the filing period for such claims under the DCHRA is one year. *See* D.C. Code § 2-1403.16 ("A private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within one year of the unlawful discriminatory act . . . ."). This filing period is tolled, however, by "the timely filing of a complaint with the [DCOHR] . . . while the complaint is pending." *Id.* at § 2-1403.16(a). As noted, under a "work-sharing agreement" between the EEOC and the DCOHR pursuant to 29 C.F.R. § 1626.10, a charge of discrimination filed with the EEOC in the District of Columbia is deemed cross-filed with the DCOHR. *See Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1372 (D.C. Cir. 2008) (interpreting work-sharing agreement and finding that agreement designates the EEOC as the "agent for the purpose of receiving and drafting charges" for the DCOHR, and vice versa, such that "for all intents and purpose, the DCOHR receives charges filed with the EEOC"); *Estenos v. PAHO/WHO Fed.*

*Credit Union*, 952 A.2d 878, 886 (D.C. 2008) (finding that "timely filing with the EEOC, of which DC OHR promptly received a copy . . . sufficed to toll the limitations period for filing in court," thus the EEOC's "timely cross-referral of [the plaintiff's] EEOC claim to the DC OHR tolled the running of the one-year statute of limitations"); *Brewer v. District of Columbia*, 891 F. Supp. 2d 126, 132 & n.5 (D.D.C. 2012) (Under the EEOC's "worksharing agreement" with the DCOHR, the EEOC sends complaints that it receives to the DCOHR, thereby satisfying the state filing requirement). Consequently, under the DCHRA, any claims that occurred over a year prior to filing a complaint with the EEOC or the DCOHR are time-barred.

The plaintiff was suspended by PDS 308 days before he filed his EEO charge on April 15, 2010, and, thus, still had access to the PDS workplace within one year of filing his EEO complaint. Consequently, the plaintiff's hostile work environment claim would not be time-barred under the DCHRA if he has plead acts contributing to this environment that continued or occurred after April 15, 2009, which is the date one year prior to the filing date of his EEO charge. The Complaint alleges that certain acts underlying any hostile work environment claims occurred on specific dates, but none of those took place within the one-year limitations period. Nevertheless, as the plaintiff points out in opposition, he has also made general allegations that "almost every day of his employment at PDS," Primo used crude verbal language, Compl. ¶ 30; Pl.'s Opp'n at 3, and this conduct may have continued into the eight weeks within the limitations period before the plaintiff was suspended between April 15, 2009, and June 11, 2009. *See Baird*, 662 F.3d at 1251 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.") (quoting *Singletary*, 351 F.3d at 526–27 and *Morgan*, 536 U.S. at 117).

Even though the plaintiff's hostile work environment claim may be timely under the DCHRA, this claim against both defendants fails for at least two reasons. First, under the DCHRA, a plaintiff must establish: "(1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Daka, Inc. v. Breiner,* 711 A.2d 86, 92 (D.C. 1998); *Joyner v. Sibley Mem'l Hosp.*, 826 A.2d 362, 372 n.11 (D.C. 2003) (same). The third factor is almost identical to that in Title VII. *See Davis*, 275 F.3d at 1122–23 (requiring proof for hostile work environment claims that "the harassment complained of was based upon" the plaintiff's protected status); *see also Baloch*, 550 F.3d at 1201 (finding that plaintiff could not support hostile work environment claim in part because "none of the comments or actions directed at [the plaintiff] expressly focused on his race, religion, age, or disability"); *Goode*, 932 F. Supp. 2d at 89 (plaintiff raising hostile work environment claim must show some "linkage between the hostile behavior and the plaintiff's membership in a protected class"); *Nguyen v. Mabus*, 895 F. Supp. 2d 158, 189 (D.D.C. 2012) ("Courts in this District have routinely held that 'hostile behavior, no matter how unjustified or egregious, cannot support a claim of hostile work environment unless there exists some linkage between the hostile behavior and the plaintiff's membership in a protected class." (quoting *Na'im*, 626 F. Supp. 2d at 73)). As noted in Part III.A.3, the plaintiff has not identified the protected class to which he belongs based on his race. *See generally* Compl. Thus, to the extent the plaintiff claims that he was subject to a hostile work environment on the basis of his race, such a claim fails *ab initio*.

Likewise, the plaintiff has failed to show that any hostile work environment claim was linked to the plaintiff's gender. Rather, the allegations in the Complaint indicate that Primo's

use of epithets and sexual innuendo were, in many instances, not directed at the plaintiff but more generally to multiple people in the office. *See, e.g.*, Compl. ¶ 20 (email sent to entire investigations division by Primo stating that she was experiencing male sexual arousal); *id.* ¶ 39 ("Primo would often tell the plaintiff *and others*," in an explicit manner, about sexual acts they could perform on her) (emphasis added); *id.* ¶ 28 ("Primo used derogatory terms to describe *anyone* who was not like her") (emphasis added); *id*. ¶ 23 (alleging that plaintiff would recount "sexual liaisons"); *id.* ¶ 27 (Primo referring to men using the opposed gendered terms of "pussy" and "tool"). Even if the plaintiff's allegations were true regarding the crude epithets used by Primo, given the allegations in the Complaint about how broadly these vulgarities were disseminated and the frequency of their use, the plaintiff does not plausibly establish that he was singled out as a target for these comments, let alone that the comments were directed at him due to his male gender or his unspecified race. *See Hampton v. Vilsack*, 760 F. Supp. 2d 38, 56 (D.D.C. 2011), *aff'd*, 685 F.3d 1096 (D.C. Cir. 2012) (citing *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997) (the fact that comments were not directed at plaintiff herself contributed to conclusion that they were merely "offensive" rather than objectively hostile)); *see also Lancaster v. Vance-Cooks*, No. 10-0940, 2013 WL 5366150, at *11 (D.D.C. Sept. 26, 2013) (finding that workplace "comments that were sexual in nature does not mean that they are actionable"); *Peters*, 873 F. Supp. 2d at 190 (finding no discriminatory intent where accused supervisor was "generally unpleasant for all the employees"). As this Circuit noted in *Davis*, 275 F.3d at 1124:

> [E]xpressions [that employ obscene language] are commonplace in certain circles, and more often that not, when these expressions are used . . . their use has no connection whatsoever with the sexual acts to which they make reference. . . . Ordinarily, they are simply expressions of animosity or juvenile provocation . . . .

*Id.* (quoting *Johnson,* 125 F.3d at 412).

Obscenity alone cannot sustain a hostile work environment claim unless there is discriminatory intent. *See Peters*, 873 F. Supp. 2d at 190 ("Indeed, even rude office conduct that generates stressful working conditions does not create liability for discrimination under Title VII, unless that conduct is 'permeated with discriminatory intimidation, ridicule, and insult.'" (quoting *Harris,* 510 U.S. at 21)). While the plaintiff has alleged the virtually habitual use of crude language by Primo, these same allegations also support the inference that the use of such language was public and indiscriminate as to the surrounding individuals. Consequently, these allegations undercut any claim that Primo's comments were targeted at the plaintiff due to his unspecified race or male gender.

Second, the plaintiff has failed to show that the charged harassment was "severe and pervasive enough to affect a term, condition, or privilege of employment," *Joyner*, 826 A.2d at 372 n.11, or "unreasonably interfere[ed] with the plaintiff's work performance." *Davis*, 275 F.3d at 1122–23. The plaintiff contends that due to his work environment, on his own initiative, he "began increasing the time that he spent working from home," Compl. ¶ 47, and altered his hours so he could "come to the office at night rather than during the day," *id*. ¶ 48. These are actions that the plaintiff voluntarily undertook, and the plaintiff has not alleged in his Complaint that he ever incurred a penalty by PDS for his election to change his work schedule. In other words, "there is no allegation that [the plaintiff] was penalized by any material adverse change in the terms or conditions of [his] employment" because of his self-imposed adjustment to his work hours.[14] *See Peters*, 873 F. Supp. 2d at 190–91 (finding that plaintiff had not established hostile

---

[14] Although the plaintiff was suspended twice and terminated, these claims form the basis of his retaliation and discrimination claims, and not part of his hostile work environment claims. *See Hampton,* 760 F. Supp. 2d at 56–57 ("Plaintiff cannot, however, rely on the discrete acts upon which he bases his discrimination and retaliation claims to support a hostile environment claim.") (citing *Franklin v. Potter,* 600 F. Supp. 2d 38, 76 (D.D.C. 2009) ("Because plaintiff's allegedly hostile events are the very employment actions he claims are retaliatory, he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.") (internal quotation marks and citations omitted)); *Wade v. District of Columbia,* 780 F. Supp. 2d 1, 19 (D.D.C. 2011) (rejecting plaintiff's

work environment where the plaintiff did not allege any write-up, reprimand, suspension, or forced transfer or any adverse personnel actions). The plaintiff's subjective impressions of his workplace, leading him to voluntarily amend his work schedule, do not change the "terms and conditions" of the plaintiff's employment. *See Robertson v. Dodaro*, 767 F. Supp. 2d 185, 200 (D.D.C. 2011) (citing *Faragher,* 524 U.S. at 788) (finding that plaintiff had failed to establish hostile work environment claim based on plaintiff's assertion that "work became emotionally draining, interactions with supervisors became stressful and combative, and efforts were consistently made to demean and belittle the [p]laintiff and deride her work product."); *Bowden*, 658 F. Supp. 2d at 82–86 (finding plaintiff's hostile work environment claim "baseless" where the plaintiff stated his workplace caused him "anxiety, stress, and . . . attendant physical and emotional traumas" but plaintiff "failed to proffer any evidence to demonstrate how many of the alleged remarks by his supervisors 'affect[ed] a 'term, condition, or privilege' of [his] employment within the meaning of Title VII") (quotation marks omitted). Consequently, the plaintiff's allegations do not state the changes to his employment necessary to sustain a hostile work environment claim.

Accordingly, the Court dismisses the plaintiff's claims insofar as they allege a hostile work environment claim under Title VII or the DCHRA against PDS or Primo.

### C. Retaliation Claim

The plaintiff has asserted claims for retaliation in Counts III and VI against PDS under Title VII and the DCHRA, respectively. Compl. ¶¶ 143–49, 170–80. In support of these claims, the plaintiff alleges that he engaged in protected activity when he complained to supervisors

effort to transform amalgamation of disparate treatment claims into cause of action for hostile work environment for lack of connection in pervasive pattern of severe harassment) (citing *Lester,* 290 F. Supp. 2d at 33 ("Discrete acts constituting discrimination or retaliation claims . . . are different in kind from a hostile work environment claim that must be based on severe and pervasive discriminatory intimidation or insult.")).

about Primo's conduct, including after Primo circulated crude emails in September and November, 2008. *Id.* ¶¶ 20–21, 38–41, 75. He also filed "a formal grievance [] against Primo on July 9, 2009," *id.* ¶ 91, as well as two EEO charges on "April 15, 2009" and "November 17, 2010," *id.* ¶¶ 118, 126; *see also* Pl's Opp'n at 4. According to the plaintiff, as a result of this protected activity, PDS retaliated against the plaintiff by: (1) suspending him, Compl. ¶ 145;[15] (2) terminating him, *id.*; (3) withholding "overtime [wages the plaintiff] was owed," *id.* ¶ 173; (4) opening an investigation into the plaintiff and the May 30, 2009 car accident and procuring an attorney to represent Primo, *id.* ¶¶ 104–05; and (5) "refus[ing] to certify [the plaintiff] as a CJA investigator, and refusing him employment opportunities," *id.* ¶ 173. PDS responds that these retaliation claims fail under Federal Rule of Civil Procedure 12(b)(6) because the plaintiff has not sufficiently pleaded facts to establish causation, and has failed to exhaust his administrative remedies with respect to some of the alleged retaliatory actions. PDS' Mem. at 10–12.

At the outset, contrary to the plaintiff's understanding, his general allegations about making informal complaints about Primo's conduct do not amount to protected activity because the plaintiff made no mention of discrimination. The plaintiff is required to allege discrimination in order for a complaint to be "protected" under Title VII. *See Peters*, 873 F. Supp. 2d at 202 (finding that plaintiffs' complaints that they were assigned too many cases and were penalized for a backlog where other workers were not failed to plead discrimination based on race); *Rattigan*, 503 F. Supp. 2d at 77 ("While no 'magic words' are required" to mark an exchange as

---

[15] The plaintiff also alleges in his Complaint that he was retaliated against because PDS "barr[ed] Plaintiff from the premise [sic], and order[ed] him not to communicate with PDS staff." Compl. ¶ 173. *See also id.* ¶¶ 92–98 (alleging that PDS retaliated against the plaintiff by: blocking the plaintiff from his PDS email account; banning him from the premises, from communicating with any PDS employees, or from accessing any PDS databases; preventing him from working on any cases; and instructing him to inquire if a warrant had been issued in his name). As noted, *supra* n.5, these are not separate acts, but are grouped together as the consequences of the plaintiff's suspension. Consequently, the Court's discussion of the plaintiff's suspension as an alleged act of retaliation incorporates these allegations.

protected activity, the employee "must in some way allege unlawful discrimination." (quoting *Broderick,* 437 F.3d at 1232)).  According to the plaintiff's own allegations, he did not raise discrimination at all in his informal complaints about Primo's conduct.  *See, e.g.*, Compl. ¶ 21 ("Plaintiff complained to supervisors" about an email from Primo to the investigations division referencing a sexual function); *id.* ¶ 41 ("Plaintiff complained about Primo's sexually explicit email").  On only four occasions did the plaintiff raise concerns that he was being discriminated against: a complaint at an unspecified time to unspecified parties about Primo's "hostile treatment of him on the basis of his gender," *id.* ¶ 38; a formal internal grievance against Primo alleging discrimination based on "race, sex, color, and religion," *id.* ¶ 91; and his two EEO complaints.  These four complaints are sufficient to show that Primo engaged in protected activity.  *See Richardson,* 477 F. Supp. 2d at 27.

The plaintiff has additionally pleaded that he suffered adverse employment actions in the form of his suspension and termination.  The additional retaliatory acts alleged by the plaintiff, including his failure to receive overtime pay, PDS' investigation of the plaintiff, and PDS' assistance in procuring Primo counsel, have not been administratively exhausted.[16]  Title VII plaintiffs must first raise an act of retaliation in an EEO complaint.  *See Williams v. Wash. Metro. Area Transit Auth.*, 721 F.2d 1412, 1418 n.12 (D.C. Cir. 1983); *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 278 (D.D.C. 2011) (collecting cases and finding that "at a minimum" plaintiff "must have raised his pre-charge retaliation allegations with the EEOC to exhaust his administrative remedies").  The plaintiff failed to raise any of these alleged acts in either his first

---

[16] The plaintiff's post-termination allegation claims alleging failure to certify and failure to hire have been administratively exhausted.  *See* Compl. ¶ 126; Koerner Decl. Ex. 6 (second EEO complaint alleging failure to hire and failure to certify which was pending before EEOC for over 180 days before plaintiff filed suit); *see also* 42 U.S.C. §§ 2000e–5(f)(1) (EEO complaint is exhausted when pending before an agency or EEOC for at least 180 days).  Yet, as noted, none of these alleged post-termination acts of discrimination state a claim for an adverse employment action.  *See supra* Part III.A.1 & n.7.  Therefore, they are not properly considered as acts of retaliation with respect to the plaintiff's retaliation claim.

or second EEO complaints, *see* Koerner Decl. Exs. 2, 6; thus, these claims will not be considered. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (holding that district court correctly dismissed retaliation claims that were not included in EEO complaint because plaintiff failed to exhaust her administrative remedies); *Wada v. Tomlinson,* 517 F. Supp. 2d 148, 183 (D.D.C. 2007) ("[A]s the Supreme Court's seminal decision in [*Morgan*] makes clear, a Title VII plaintiff is required to exhaust his or her administrative remedies with respect to each discrete allegedly discriminatory or retaliatory act."), *aff'd,* 296 Fed. Appx. 77 (D.C. Cir. 2008).

1.    *Insufficient Pleading of Causal Link Between Protected Activity and Plaintiff's Suspension/Termination*

The viability of the plaintiff's retaliation claim rests on the sufficiency of his allegations that the adverse employment actions he allegedly suffered from his suspension and termination were a result of his engagement in the protected activity on the four occasions described above: namely, his complaint at an unspecified time to unspecified parties about Primo's "hostile treatment of him on the basis of his gender," *id.* ¶ 38; plaintiff's formal internal grievance against Primo alleging discrimination based on "race, sex, color, and religion," *id.* ¶ 91; and his two EEO complaints. *See Howard R.L. Cook & Tommy Shaw Found. for Black Emps. of the Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013); *see also Nassar*, 133 S. Ct. at 2532–33. The plaintiff, however, fails to state the requisite causal connection between his protected activity and any alleged adverse employment actions for three reasons. First, the plaintiff cannot base his retaliation claim on the grounds that PDS retaliated against him for his EEO complaints since the plaintiff's suspension and termination occurred *before* he filed his first EEO complaint. Specifically, the plaintiff filed his EEO complaints on April 15, 2010, and on November 17, 2010, *see* Koerner Decl. Exs. 2, 6, Compl. ¶ 126, after the plaintiff was suspended with pay, *see* Compl. ¶¶ 98–99; Koerner Decl. Ex. 1 (letter, dated June 11, 2009, suspending the

plaintiff), suspended without pay, Compl. ¶ 102, and terminated, *id.* ¶ 108; Koerner Decl. Ex. 2 at 3 (EEOC complaint, dated April 15, 2010, alleging that the plaintiff was terminated March 3, 2010). Thus, PDS could not have suspended or terminated the plaintiff because of the EEO complaints because such a charge did not then exist. No retaliation claim can survive on this basis.

Second, the only possible protected activities that could sustain the plaintiff's retaliation claim are his formal and informal internal complaints against Primo, but the allegations surrounding these internal complaints render them insufficient.[17] Specifically, the plaintiff cannot establish a causal connection between his internal complaints against Primo and his suspension and/or termination because he has plead no facts to establish that the officials at PDS, who made the decisions to suspend and terminate him, would have retaliated against the plaintiff for complaints he filed against Primo. The plaintiff has not alleged that Primo made these decisions or was even a critical force behind these decisions. On the contrary, the plaintiff alleges that a different manager was instrumental in setting the conditions for his suspension and his termination. Compl. ¶¶ 98–101; *see also id.* ¶ 71. *See Peters*, 873 F. Supp. 2d at 203–04 (finding that "the causal link" was "too tenuous" where the plaintiff never alleged that he complained about the supervisor who engaged in the alleged retaliatory act, but a different supervisor); *Perry v. Clinton*, 831 F. Supp. 2d 1, 24 (D.D.C. 2011) (finding no causal link in retaliation claim where plaintiff "provided no evidence or argument explaining why [her first-

---

[17] The plaintiff contends in his opposition that he has sufficiently plead retaliation, directing the Court to "the explicit language of the Complaint" alleging that PDS took adverse actions against the plaintiff "[i]n retaliation for Plaintiff's complaints about EEO violations." Pl.'s Opp'n at 3 (citing Compl. ¶ 102). Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" at the pleading stage. *Iqbal,* 556 U.S. at 678. Simply because the plaintiff has asserted that he faced retaliation does not make it so. The plaintiff must "plead[] factual content" to support his claims. *Id.* As discussed below, the plaintiff has failed to plead sufficient facts to establish that PDS took retaliatory acts against him because he complained about his supervisor.

line supervisor] would decide to retaliate against *her* because she filed a complaint against someone else." (emphasis in original)). Moreover, on a separate occasion, the plaintiff alleges he complained about a co-worker's inappropriate conversations and conduct, and PDS supervisors investigated the plaintiff's complaint without taking any adverse action against the plaintiff. *See* Compl. (unredacted) ¶¶ 69–71. This does not support the inference that PDS would retaliate against an employee for complaining internally about a supervisor. Consequently, because the "causal link" here is "tenuous," *Peters*, 873 F. Supp. 2d at 203–04, the plaintiff has failed to establish a *prima facie* case of retaliation.

2. *PDS Sufficiently Demonstrated Legitimate, Nondiscriminatory Basis for Plaintiff's Alleged Adverse Employment Actions*

Even if the plaintiff had succeeded in stating a *prima facie* case of retaliation, under the burden-shifting *McDonnell Douglas* framework, the plaintiff's claims would still fail because PDS has established a "non-discriminatory justification for its actions." *Vickers,* 493 F.3d at 195 (quoting *Aka,* 156 F.3d at 1289); *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 71 (D.D.C. 2011) (recognizing that "defendants that are able to articulate a legitimate, non-discriminatory explanation for their actions can sufficiently defeat a presumption of discrimination"). PDS has presented documentation regarding events obliquely referenced in the Complaint that compellingly demonstrates that the plaintiff was suspended with pay, without pay, and ultimately terminated, as a result of the May 30, 2009 car accident, for which the plaintiff was convicted of a criminal misdemeanor offense. *See* Koerner Decl. Exs. 1–2, 4–6; Compl. ¶¶ 82–88. Indeed, the chain of events leading to the plaintiff's suspension strongly suggests that the plaintiff's internal complaints about Primo played no part in PDS' decision-making. The plaintiff was suspended with pay within two weeks of the accident, Compl. ¶¶ 82–88; Koerner Decl. Ex. 1, before he had filed his "formal grievance" against Primo, Compl. ¶ 91. In the June 11, 2009

suspension letter, PDS informed the plaintiff that "[i]f there [was] a warrant for [his] arrest, PDS will assess the situation and determine [his] status at that time."  *See* Koerner Decl. Ex. 1. Thereafter, PDS suspended the plaintiff without pay, within three weeks of Arlington County issuing a felony arrest warrant for the plaintiff for leaving the scene of the accident without reporting it.  Koerner Decl. Exs. 2, 5; Compl. ¶ 102.  The plaintiff was ultimately terminated 37 days after he pled guilty to driving under the influence while driving Primo's car.  Koerner Decl. Ex. 2, 3 (plea agreement).  This was over seven months after the plaintiff had filed his formal grievance against Primo.

The timing sequence and length of time between the alleged protected activity and the plaintiff's termination strongly indicates that the plaintiff's conduct in connection with the car accident and his subsequent criminal conviction were the reasons for his termination, which significantly undercuts the plaintiff's claims that his suspension and termination were based on his protected activity.  The plaintiff failed to present any, let alone sufficient, evidence to rebut PDS' legitimate, nondiscriminatory reason for the plaintiff's suspension and termination.  *See Joshi v. Prof'l Health Servs., Inc.*, 817 F.2d 877, 881 (D.C. Cir. 1987) (holding that defendant's decision not to hire plaintiff was not retaliatory where the defendant alleged it "was made on the basis that she was not compatible with the group of emergency room doctors who were hired by the hospital, that she could not work cooperatively with the staff and management of the hospital, that she was a disruptive force, and that if she had been hired, other doctors may have resigned" and plaintiff did not refute this); *Byrd*, 807 F. Supp. 2d at 71 (citing *Reeves,* 530 U.S. at 142 (concluding that the defendant rebutted the plaintiff's *prima facie* case by identifying non-discriminatory factors that motivated its decision)); *Vickers,* 493 F.3d at 195 (dismissal warranted when plaintiff failed to raise any evidence to "attack the employer's proffered

explanation for its actions" or present "any further evidence of discrimination" (quoting *Aka,* 156 F.3d at 1289)); *see generally* Pl.'s Opp'n.

The plaintiff suggests in his Complaint that PDS "terminated plaintiff on the pretext 'that he was vulnerable to being impeached upon testifying,'" Compl. ¶ 108, because PDS has employed other investigators with criminal records. This argument is unconvincing because none of the other employees the plaintiff references apparently incurred criminal charges during the course of their employment, and their underlying conduct did not endanger a fellow colleague at PDS. *See* Compl. (unredacted) ¶ 73 (alleging that colleague was internally reprimanded for misconduct—though never convicted—and was permitted to continue working at PDS); Compl. ¶ 113–115 (alleging that Primo had been "convicted of a possessory crime" and "possession of false identification" prior to beginning her employment, but PDS "continue[d] to employ her" after it discovered the charges); Compl. (unredacted) ¶ 116 (alleging that colleague continues to be employed by PDS despite a conviction on an unspecified date). Consequently, the plaintiff has failed to establish that PDS' reason for suspending and terminating him were merely pretextual. Rather, under the *McDonnell Douglas* framework, PDS has shown a legitimate, non-discriminatory reason for taking adverse employment action against the plaintiff.

The plaintiff has failed to allege sufficiently a causal link between his EEO-protected activity and PDS' adverse employment actions and, further, to rebut PDS' legitimate, nondiscriminatory grounds for his suspension and termination or show that these adverse employment actions were merely a pretext. Accordingly, the plaintiff's retaliation claims are dismissed for failure to state a claim.

### D. The Common Law Claims Sounding in Tort and Contract Are Time-Barred

The plaintiff alleges two common law claims against PDS: that PDS breached its oral contract with the plaintiff by terminating him even though no line of adverse cross-examination

was developed against him, Compl. ¶¶ 9, 195–99 (Count IX), and that PDS breached its duty of good faith and fair dealing to the plaintiff by "engaging in conduct to attempt to discredit Plaintiff and prevent him from being gainfully employed in the future, fabricating reasons to investigate Plaintiff, taking away Plaintiff's job responsibilities and authority, defaming him, failing to rectify discriminatory and retaliatory practices against him, failing to provide agreed upon overtime, and terminating him." *Id.* ¶ 202 (Count X). The plaintiff's third common law claim alleges that Primo tortiously interfered with his contractual relations with PDS by "lying about Plaintiff's performance, [and] lying about his conduct in an off-duty car accident," which thereby "injur[ed] Plaintiff's reputation." *Id.* ¶¶ 207–14 (Count XI). The statute of limitations for contract and tort claims is three years. D.C. Code § 12-301(7), (8). The plaintiff was terminated on March 3, 2010, *see* Koerner Decl. Ex. 2, and filed the instant suit on May 30, 2013, *see generally* Compl. (unredacted), two months and 27 days after the expiration of the three-year statute of limitations. Thus, as explained further below, the plaintiff's common law claims are time-barred.[18]

This Circuit has "repeatedly held that courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). "[D]ismissal is appropriate only if the complaint on its face is conclusively time-barred." *Id.* Accordingly, a "motion to dismiss may be granted on the basis that the action is time-barred only when it appears from the face of the complaint that the

---

[18] The Court has jurisdiction over the plaintiff's common law claims in Counts IX–XI under 28 U.S.C. § 1367 because these are part of the same case or controversy as the Title VII claims. *See, e.g.*, *Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 126–27 (D.D.C. 2012) (noting that because "all of Plaintiff's non-federal claims are sufficiently interrelated, the Court retains jurisdiction over the entire suit"). Despite dismissal of the plaintiff's federal claims, retention of supplemental jurisdiction over the remaining common law claims is appropriate for purposes "of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 423–24 (D.C. Cir. 2005) ("A district court may choose to retain jurisdiction over, or dismiss, pendent state law claims after federal claims are dismissed." (citing 28 U.S.C. § 1367(c)(3))).

relevant statute of limitations bars the action." *Doe v. United States Dep't of Justice,* 753 F.2d 1092, 1115 (D.C. Cir. 1985); *see also Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 109 (D.D.C. 2002) (noting that statute of limitations defense may be resolved when "there are no outstanding factual issues in dispute that would preclude the resolution of [the statute of limitations] issue on a motion to dismiss").

As noted, the statute of limitations in the District of Columbia for raising a claim in tort, or "on a simple contract, express or implied," is three years. *See* D.C. Code § 12-301(7), (8); *see also Murray v. Wells Fargo Home Mortgage*, 953 A.2d 308, 319–20 (D.C. 2008) (recognizing a three-year statute of limitations for contract claims). "Where the fact of an injury can be readily determined, a claim accrues at the time that the plaintiff suffers an alleged injury." *The Plan Comm. v. PricewaterhouseCoopers, LLP*, 335 B.R. 234, 252 (D.D.C. 2005) (citing *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 660 (D.C. 1997)). *See also Jacobsen*, 201 F. Supp. 2d at 109 (finding that "[t]he statute of limitations on a tort claim ordinarily begins to run when plaintiffs sustain a tortious injury"); *Nattah v. Bush*, 770 F. Supp. 2d 193, 207 (D.D.C. 2011) ("The general rule in the District is that a claim for breach of contract accrues 'when the contract is first breached.'" (citing *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 146 F.3d 983, 992 (D.C. Cir. 1998))); *Computer Data Sys., Inc. v. Kleinberg*, 759 F. Supp. 10, 15 (D.D.C. 1990) ("In the District of Columbia, an action for breach of contract runs from the time of the breach or completion of the contract."). Where an injury is not readily determined, "[a]t the latest . . . a cause of action accrues for limitations when the plaintiff knows or by the exercise of reasonable diligence should know (1) of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Beard v. Edmondson & Gallagher*, 790 A.2d 541, 546 (D.C. 2002) (quoting *Hendel v. World Plan Executive Council,* 705 A.2d 656, 660–61 (D.C.1997) (internal citations

and quotation marks omitted). With respect to all three of the plaintiff's common law claims, the injury can be readily determined as the date the plaintiff was fired, which fact is fatal to each of the plaintiff's common law claims, as discussed below.

1. *Breach of Contract Claim in Count IX*

The plaintiff's breach of contract claim is based on his termination, which allegedly breached the purported oral contract between PDS and the plaintiff. *See* Compl. ¶¶ 195–99. "The statute of limitations [for breach of contract claims] begins to run at the time the contract is breached," *see Murray*, 953 A.2d at 321; *see also LoPiccolo v. Am. Univ.*, 840 F. Supp. 2d 71, 77–78 (D.D.C. 2012) ("Other courts in this district, as well as the District of Columbia courts, have held that a breach of contract claim accrues when the plaintiff is notified of his or her termination or non-renewal." (citing *Allison v. Howard Univ.,* 209 F. Supp. 2d 55, 60 (D.D.C. 2002), *Harris v. Ladner,* 828 A.2d 203, 206 (D.C. 2003), and *Stephenson v. Am. Dental Ass'n,* 789 A.2d 1248, 1251–52 (D.C. 2002))). In this case, the latest date on which the plaintiff's breach of contract claim could accrue would be the date PDS allegedly breached the plaintiff's employment contract by actually terminating him, on March 3, 2010. *See* Koerner Decl. Ex. 2. This date is beyond the applicable three-year statute of limitations applicable to the plaintiff's breach of contract claim in Count IX, which is therefore time-barred.

2. *Breach of Duty of Good Faith and Fair Dealing in Count X*

Similarly, the plaintiff's cause of action for breach of PDS' duty of good faith and fair dealing accrued on the date the plaintiff was terminated. In the District of Columbia, the breach of the duty of good faith and fair dealing is an "implied duty" that stems from the contract itself, "which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009) (quoting *Allworth v. Howard Univ.*, 890

A.2d 194, 201 (D.C. 2006)); *see also* Compl. ¶ 201–02 (plaintiff pleads that PDS breached its duty "of good faith and fair dealing in honoring its Contract with Plaintiff.").  Thus, the date PDS allegedly breached the contract by terminating the plaintiff, on March 3, 2010, is the same date PDS allegedly breached its duty of good faith to the plaintiff.  *See LoPiccolo*, 840 F. Supp. 2d at 79 (concluding that statute of limitations accrued on plaintiff's claim for breach of the duty of good faith and fair dealing on the same date the contract was breached); *Murray*, 953 A.2d at 321 (finding that duty of good faith and fair dealing claim accrued when the contract was breached).  Similarly to the plaintiff's breach of contract claim, the date of any purported breach of the duty of good faith to the plaintiff occurred more than three years before the filing of the instant Complaint.  Consequently, the plaintiff's claim in Count X is barred by the three-year statute of limitations.[19]

### 3. *Tortious Interference with Contractual Relations in Count XI*

Finally, the claim that Primo tortiously interfered with plaintiff's contract prior to his termination also accrued on or before the date the plaintiff was terminated.  The plaintiff claims that Primo, "in an effort to have Plaintiff terminated," "misrepresented . . . facts concerning Primo and Plaintiff's conduct surrounding the off-duty accident."  Compl. ¶ 90.  It is clear that the plaintiff knew or should have known of these alleged misrepresentations when PDS suspended him and later terminated him in connection with the May 30, 2009 car accident.  *See Ling Yuan Hu v. George Washington Univ.*, 766 F. Supp. 2d 236, 243 (D.D.C. 2011), *aff'd*, No. 11-7014, 2011 WL 3241457 (D.C. Cir. July 6, 2011) (noting that "a claim of breach of fiduciary duty must be brought within three years of when the plaintiff knows or through the exercise of due diligence should have known the this breach of a fiduciary duty occurred").  The plaintiff

---

[19] Even if the alleged breach of the duty of good faith and fair dealing were deemed to accrue as of the date of the plaintiff's first suspension on June 11, 2009, this claim would be even further outside the applicable statute of limitations and, therefore, would still be time-barred.

would surely inquire into the reasons behind his suspension and would have been given reasonable notice of Primo's statements. Through the "exercise of reasonable diligence" the plaintiff could have learned of Primo's tortious interference when he was first suspended or when he was actually terminated. *See Beard*, 790 A.2d at 546. Consequently, the plaintiff's claim against Primo in Count XI accrued more than three years before he filed suit and is time-barred.

### 4. *Miscellaneous Post-Termination Actions by PDS*

The plaintiff additionally alleges in the Complaint that PDS failed to rehire the plaintiff for open positions, and failed to admit the plaintiff into an investigator certification program, both of which occurred after his termination and within three years of his filing the present suit. *See* Compl. ¶¶ 119–125. The plaintiff does not allege an independent cause of action in common law based on these incidents. *See generally* Compl. Yet, these instances cannot act to extend the accrual date of the plaintiff's contract claims against PDS. For statute of limitations purposes, the accrual date begins on the date the contract is breached, not on the date of related incidents. *See Wright v. Howard Univ.*, 60 A.3d 749, 752–53 & n.2 (D.C. 2013) (declining to find that defendant's alleged breaches of plaintiff's contract were "continuing" and extended date of accrual for statute of limitations purposes where plaintiff "provide[d] no argument of any kind" to support "a contention that the alleged breaches at issue in this case should be viewed as continuous"); *Press v. Howard Univ.*, 540 A.2d 733, 734–35 (D.C. 1988) (rejecting "continuing breach of contract" theory and holding that statute of limitations on employee's breach of contract claim began to accrue on the date he was first suspended, even though plaintiff was thereafter suspended two more times and subject to three-year grievance proceeding resulting in his reinstatement). Consequently, any post-termination actions, to the extent they form part of the plaintiff's common law claims against PDS, are also time-barred. All the plaintiff's claims

accrued, at the latest, when his employment contract was breached, over three years before he filed suit.  Consequently, his common law claims are not timely.

Accordingly, the Court dismisses the plaintiff's common law claims against PDS in Counts IX and X, and against Primo in Count XI, as barred by the statute of limitations.

## IV.    CONCLUSION

Accordingly, for the reasons stated above, the Court dismisses the plaintiff's claims in their entirety. An appropriate order accompanies this Memorandum Opinion.


Date:  April 2, 2014

_____
BERYL A. HOWELL
United States District Judge